## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JAMES MUELLER, on behalf of himself
and all others similarly situated,

        Plaintiff,

        v.

SIRIUS XM RADIO INC.,

        Defendant.

Civil No. 1:20-cv-09339-JMF

### SIRIUS XM RADIO INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY PROCEEDINGS AND COMPEL COMPLIANCE WITH DISPUTE RESOLUTION PROCEDURES IN THE PARTIES' AGREEMENT

Lee A. Armstrong
Allison L. Waks
JONES DAY
250 Vesey Street
New York, New York
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: laarmstrong@jonesday.com
Email: awaks@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

*Attorneys for Defendant Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

I.      STATEMENT OF FACTS ........................................................................ 2

      A.      Mueller's Complaint Against Sirius XM ...................................... 2

      B.      Mueller "Signed Up" for Sirius XM's Satellite Radio Service and Sirius XM Sent Mueller a Customer Agreement Governing His Service ........................................................................................... 3

      C.      The Customer Agreement Requires Informal And Alternative Dispute Resolution ...................................................................... 5

II.     ARGUMENT .......................................................................................... 6

      A.      The Applicable Legal Standard .................................................... 6

      B.      Mueller's Claims, If Not Informally Resolved, Must Be Arbitrated ........ 9

            1.      Mueller Received the Customer Agreement................................. 9

            2.      The Customer Agreement Contained A Valid And Enforceable Alternative Dispute Resolution Clause To Which Mueller and Sirius XM Are Contractually Bound. .......... 12

            3.      Mueller's Dispute Falls Squarely Within the Scope of the Arbitration Provision, And Any Doubts Must be Resolved by the Arbitrator in Arbitration.................................................... 16

      C.      Mueller Has Failed to Comply With the Dispute Resolution Provisions of His Customer Agreement ................................. 20

III.    CONCLUSION ...................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACE Ltd. v. CIGNA Corp. and CIGNA Holdings, Inc.*,
No. 00 CIV. 9423 WK, 2001 WL 767015 (S.D.N.Y. July 6, 2001)........................................18

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)..........................................................................................................7, 8

*Andersen v. Walmart Stores, Inc.*,
No. 16-CV-6488 CJS, 2017 WL 661188 (W.D.N.Y. Feb. 17, 2017)......................................14

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)..........................................................................................................7, 8

*Biggs v. Midland Credit Management, Inc.*,
No. 17-CV-340 (JFB)(ARL), 2018 WL 1225539 (E.D.N.Y. Mar. 9, 2018)..........................10

*Bischoff v. DirecTV, Inc.*,
180 F. Supp. 2d 1097 (C.D. Cal. 2002) ...............................................................................15

*Boomer v. AT&T Corp.*,
309 F.3d 404 (7th Cir. 2002) ..............................................................................................15

*Bronia, Inc. v. Ho*,
873 F. Supp. 854 (S.D.N.Y. 1995)......................................................................................10

*Brower v. Gateway 2000, Inc.*,
676 N.Y.S.2d 569 (1st Dep't 1998) ...............................................................................13, 14

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991)............................................................................................................14

*Carr v. Credit One Bank*,
No. 15-cv-6663 (LAK), 2015 WL 9077314 (S.D.N.Y. Dec. 16, 2015) ................................18

*Chen-Oster v. Goldman, Sachs & Co.*,
449 F. Supp. 3d 216 (S.D.N.Y. 2020)...................................................................................1

*China Auto Care, LLC v. China Auto Care (Caymans)*,
859 F. Supp. 2d 582 (S.D.N.Y. 2012)..................................................................................17

*Collins & Aikman Products Co. v. Building Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995) ...................................................................................................17

*Combs v. Sirius XM Radio, Inc.*,
   No. 7:15-cv-00037-FL, 2016 WL 6778856 (E.D.N.C Jan. 7, 2016) ......................................16

*Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*,
   77 F.3d 16 (2d Cir. 1996) ...........................................................................................................20

*Contec Corp. v. Remote Solution Co.*,
   398 F.3d 205 (2d Cir. 2005)................................................................................................19, 20

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)................................................................................................................7, 8

*Dominion Transmission, Inc. v. Precision Pipeline, Inc.*,
   No. 3:13cv442–JAG, 2013 WL 5962939 (E.D. Va. Nov. 6, 2013).........................................20

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018).............................................................................................................7, 8

*Fisher's Blend Station, Inc. v. Tax Comm'n of Wash.*,
   297 U.S. 650 (1936).....................................................................................................................7

*Getz v. Verizon Commc'ns, Inc.*,
   No. 18cv4652(DLC), 2018 WL 5276426 (S.D.N.Y. Oct. 24, 2018).......................................18

*Green Tree Fin. Corp. v. Randolph*,
   531 U.S. 79 (2000).......................................................................................................................9

*Gutierrez v. Wells Fargo Bank, N.A.*,
   889 F.3d 1230 (11th Cir. 2018) ..................................................................................................1

*Higgs v. Auto. Warranty Corp. of Am.*,
   134 F. App'x 828 (6th Cir. 2005) .............................................................................................15

*Hill v. Gateway 2000, Inc.*,
   105 F.3d 1147 (7th Cir. 1997) ..................................................................................................15

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
   387 F.3d 163 (2d Cir. 2004).........................................................................................................8

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) ....................................................................................................16

*Kowalski v. YellowPages.com, LLC*,
   No. CIV.A. 09-2382 (PGS), 2010 WL 3323749 (D.N.J. Aug. 18, 2010) ...............................13

*Kurz v. Chase Manhattan Bank USA, N.A.*,
   319 F. Supp. 2d 457 (S.D.N.Y. 2004).......................................................................................10

*Kutluca v. PQ New York Inc.*,
   266 F. Supp. 3d 691 (S.D.N.Y. 2017).......................................................................................13

*Leibowitz v. Cornell Univ.*,
  584 F.3d 487 (2d Cir. 2009)........................................................................................12

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
  252 F.3d 218 (2d Cir. 2001).........................................................................................17

*Lozada v. Progressive Leasing d/b/a Prog Leasing LLC*,
  No. 15-CV-2812 (KAM)(JO), 2016 WL 3620756 (E.D.N.Y. June 28, 2016) ........................8

*Manigault v. Macy's East, LLC*,
  318 F. App'x 6 (2d Cir. 2009) ......................................................................................13

*McCormick v. Citibank, NA*,
  No. 15-CV-46-JTC, 2016 WL 107911 (W.D.N.Y. Jan. 8, 2016)........................................8

*McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*,
  858 F.2d 825 (2d Cir. 1988).........................................................................................18

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985)....................................................................................10, 12

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)..............................................................................8, 9, 12, 17

*Microsoft Corp. v. Samsung Elec. Co., Ltd.*,
  60 F. Supp. 3d 525 (S.D.N.Y. 2014).............................................................................18

*Moore v. T-Mobile USA Inc.*,
  548 F. App'x 686 (2d Cir. 2013) ....................................................................................8

*Mortimer v. First Mount Vernon Indus. Loan Ass'n*,
  No. Civ. AMD 03–1051, 2003 WL 23305155 (D. Md. May 19, 2003)...............................20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983).........................................................................................................8

*Olsen v. Charter Commc'ns, Inc.*,
  No. 18CV3388 (JGK), 2019 WL 3779190 (S.D.N.Y. Aug. 9, 2019) ...................................13

*Oracle Am. v. Myriad Grp.*,
  724 F.3d 1069 (9th Cir. 2013) ......................................................................................20

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004).........................................................................................17

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*,
  991 F.2d 42 (2d Cir. 1993)......................................................................................8, 12

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004).........................................................................................12

*Residential Holding Corp. v. Scottsdale Ins. Co.*,
   729 N.Y.S.2d 776 (2d Dep't 2001).........................................................................9

*Salerno v. Credit One Bank, NA*,
   No. 15-CV-516-JTC, 2015 WL 6554977 (W.D.N.Y. Oct. 29, 2015) ......................8

*Schwartz v. Comcast Corp.*,
   256 F. App'x 515 (3d Cir. 2007) ....................................................................9, 11

*Sherr v. Dell, Inc.*,
   No. 05 CV 10097(GBD), 2006 WL 2109436 (S.D.N.Y. July 27, 2006)................14

*Spetalieri v. Kavanaugh*,
   36 F. Supp. 2d 92 (N.D.N.Y. 1998) .....................................................................7

*Tattoo Art, Inc. v. TAT Int'l, LLC*,
   711 F. Supp. 2d 645 (E.D. Va. 2010) ................................................................20

*Terminix Int'l Co. LP v. Palmer Ranch LP*,
   432 F.3d 1327 (11th Cir. 2005) .........................................................................20

*U.S. v. Carnes*,
   309 F.3d 950 (6th Cir. 2002) ...............................................................................7

*Velez v. Credit One Bank*,
   No. 15-CV-4752 (PKC), 2016 WL 324963 (E.D.N.Y. Jan. 25, 2016)...................8

*Vera v. Saks & Co.*,
   335 F.3d 109 (2d Cir. 2003)...............................................................................18

*Wijesinha v. DIRECTV, LLC*,
   No. 1:16-cv-22090-KMM, 2016 WL 10906449 (S.D. Fla. Sept. 29, 2016)..........18

*Wright v. Sirius XM Radio Inc.*,
   No. SACV 16-01688 JVS (JCGx),
   2017 WL 4676580 (C.D. Cal. June 1, 2017) ................................................11, 16

**STATUTES**

Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) ..........................................................1, 7

Telephone Consumer Protection Act, 47 U.S.C. § 227 ...............................................3

**OTHER AUTHORITIES**

47 C.F.R. § 64.1200(f)(5) ...........................................................................................3

Restatement (Second) of Contracts § 69(1)(a) (Am. Law. Inst. 1981).........................13

Pursuant to the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) ("FAA"), Defendant Sirius

XM Radio Inc. ("Sirius XM") moves this Court for an order staying the putative Class Action

Complaint, dated November 6, 2020 (the "Complaint"), filed by Plaintiff James Mueller

("Plaintiff" or "Mueller"), and compelling Mueller to honor the alternative dispute resolution

procedures in the parties' Customer Agreement.[1]

## **INTRODUCTION**

Mueller's and Sirius XM's contractual relationship began on May 13, 2020, when

Mueller called Sirius XM and, as Mueller has described it, "signed up" for a three-month trial

subscription to Sirius XM satellite radio.  He knew about the service before he called Sirius XM.

Mueller had just bought a certified pre-owned 2018 Subaru Outback, and the Subaru dealership

had told him that the Subaru came equipped with a three-month Sirius XM subscription.  Mueller

contacted Sirius XM to activate the service.

The following day, Sirius XM mailed to Mueller's Sioux Falls, South Dakota home a

"Welcome Kit" that explained Mueller's All Access Trial that he received in connection with his

purchase of his 2018 Subaru Outback.  That Welcome Kit included a Customer Agreement

(which included the terms and conditions, including an arbitration provision, governing Sirius

---

[1] Mueller asserts class claims on behalf of other consumers who, like Mueller, have contractually agreed to arbitrate any disputes with Sirius XM and who have also waived their right to participate in this action.  Sirius XM preserves all of its rights with respect to those unnamed putative class members.  *See Gutierrez v. Wells Fargo Bank, N.A.*, 889 F.3d 1230 (11th Cir. 2018) (holding no waiver of arbitration rights against unnamed class members, where defense raised throughout litigation); *id.* at 1238 ("[I]t would have been impossible in practice to compel arbitration against speculative plaintiffs and jurisdictionally impossible for the District Court to rule on those motions before the class was certified."); *see also Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216 (S.D.N.Y. 2020) (holding that defendant did not waive its right to arbitration of unnamed class members, despite ten years of litigation, where defendant repeatedly asserted its intent to compel arbitration); *id.* at 234–35 ("[T]he earliest time to compel arbitration is after class certification," when "previously putative class members first become subject to a court's jurisdiction.").

Sirius XM cannot now compel arbitration of any disputes that any of those absent class members may have against Sirius XM—even assuming that any of them has a dispute—because those unnamed putative class members are not presently before this Court.

XM's relationship with Mueller).  Mueller's receipt of these written terms and conditions, and his subsequent conduct, established a binding contract with Sirius XM.

Toward the end of Mueller's three-month trial, Sirius XM's call agents attempted to call Mueller to ask how he was enjoying his trial and to offer him a paid subscription if he wanted to continue with his service.  Mueller now sues over these six phone calls.  But there can be no genuine dispute that Mueller's claims fall within the Customer Agreement, which is the binding contract that prohibits this very litigation and requires alternative dispute resolution.  As a result, this case must be stayed pending the parties' adherence to those alternative dispute resolution procedures.

## I.   STATEMENT OF FACTS

### A.   Mueller's Complaint Against Sirius XM[2]

Sirius XM is a satellite radio service that broadcasts numerous channels of commercial-free music, sports, news, talk, entertainment, traffic and weather to more than 34 million subscribers.  Compl. ¶ 17; *see also* Declaration of Elizabeth Ruhland, dated January 13, 2021 ("Ruhland Decl.") ¶ 3.

Mueller alleges that he "signed up for a free trial" of Sirius XM's satellite radio service on May 13, 2020.  Compl. ¶ 5.  Thereafter, according to Mueller, between July and August 2020, Sirius XM made "numerous robocalls" to him on his cellular phone for telemarketing purposes. *Id.* ¶ 2.  Mueller lists a total of six calls.  *Id.* ¶ 4.  Mueller alleges that the calls were made using an Automatic Telephone Dialing System, or "ATDS," without his prior express written consent, and violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

---

[2] For purposes of this motion only, Sirius XM assumes the truth of the allegations contained in the Complaint.

Mueller seeks to represent two separate classes.  *First*, an "Autodialer Class," defined as "[a]ll individuals in the United States who received one or more calls on their cellular telephones from Defendant."  *Id.* ¶ 23.  *Second*, a "National Do Not Call Class," defined as "[a]ll individuals registered on the National Do Not Call Registry whom Defendant called more than one time in a 12-month period on their cellular or landline phone where each call was made more than 30 days after registration."  *Id.* ¶ 25.[3]  The Complaint asserts two causes of action, both arising out of Sirius XM's alleged violations of the TCPA.  The first cause of action, for knowing and/or willful violations, seeks trebled statutory damages of $1,500 per offending call (Count 1); the second cause of action, for negligent violations, seeks statutory damages of $500 per offending call (Count 2).

### B.     Mueller "Signed Up" for Sirius XM's Satellite Radio Service and Sirius XM Sent Mueller a Customer Agreement Governing His Service

Mueller phoned Sirius XM to sign up for its satellite radio service on May 13, 2020. Compl. ¶ 5; Ruhland Decl. ¶ 23.  The following day, on May 14, 2020, Sirius XM, in accordance with its customary business practices, instructed its vendor, Quad/Graphics, Inc. ("Quad"), to mail Mueller a Welcome Kit, which contained a welcome letter addressed to Brandon Mueller,[4] brochures describing various features of Sirius XM included in the "All Access Trial," a channel lineup, and the terms and conditions governing his service (the "Customer Agreement").

---

[3] Mueller will not be able to represent this second class—by his own admissions, he had an "established business relationship," or "EBR," with Sirius XM.  Even in the absence of a purchase, an individual forms an EBR with a business when he voluntarily communicates, "with or without an exchange of consideration," by making an "inquiry or application regarding [the business's] products or services" within three months before the telephone solicitation, or through a transaction with the company 18 months prior to the call.  47 C.F.R. § 64.1200(f)(5). Mueller formed an EBR with Sirius XM when he called to "sign up" for his trial subscription.  Compl. ¶ 5.  And, as he alleges, the calls ceased on August 11, 2020, within three months of his transaction or inquiry on May 13, 2020. *Id.* ¶ 4.  Sirius XM will move to dismiss that claim in any arbitration.

[4] Mueller had requested that the account be set up not in his name but in the name of Brandon Mueller. Ruhland Decl. ¶ 24.

Ruhland Decl. ¶¶ 25–30 (describing procedure for mailing Welcome Kits to subscribers); Ex. C (showing May 14, 2020 date); Ex. A at 14–15 (copy of the Customer Agreement).  The outside of the envelope conspicuously advised: "**IMPORTANT INFORMATION** About the **Satellite Radio Service** in **Your Vehicle**."  Ex. A at 14; *see also* Ruhland Decl. ¶ 15.  The Customer Agreement included an alternative dispute resolution provision prohibiting the litigation of any disputes between Sirius XM and its customers.

Specifically, Sirius XM's business records show that it sent a mailing list to Quad including a data record for each of the subscribers to whom Quad should send a Welcome Kit; the list included a record for Mueller.  As it was contractually required to do, Quad then standardized and cross-checked all of the addresses in the file (including Mueller's) to ensure that it was a usable address; Quad then printed, packaged, shrink-wrapped, and sent the Welcome Kit for each subscriber to the United States Postal Service ("USPS") for delivery to each of them.  Pursuant to the contractual arrangement between Sirius XM and Quad, Quad would have informed Sirius XM if Mueller's address was unusable, but Quad did not do so. *Id.* ¶ 30.

The USPS received the Welcome Kit on May 18, 2020 and subsequently delivered it to Mueller at his Sioux Falls, South Dakota residence.  *Id.* ¶¶ 26–28; Ex. D (USPS bulk mailing receipt).  The USPS then reported to Sirius XM the "estimated" date of delivery for each mailing, including for the Welcome Kit mailed to Mueller.  Sirius XM recorded those dates in its marketing database, which show that the Welcome Kit was scheduled to arrive at Mueller's home on May 22, 2020, which is 4 business days after mailing on May 18, and within the 3 to 5 business days promised by the USPS for in-home delivery.  Ruhland Decl. ¶ 29.  Records from the USPS, provided to Sirius XM through Quad, confirm that the barcode on Mueller's Welcome

Kit was last scanned on May 22, 2020, which means that the Welcome Kit was actually delivered either that day or the following day.  *Id.* ¶ 29; Ex. E at 6 (Vision screen shots).

The Customer Agreement contains various terms and conditions, including a description of the service, the terms of usage, and the mandatory arbitration provision, as well as the subscriber's right to reject those terms and cancel the Agreement.  Ex. A, Customer Agreement at 1.

The top of the front page of the Customer Agreement states in bold: "**CUSTOMER AGREEMENT – PLEASE READ**."  It goes on to say, "This customer agreement (this "Agreement") between you ("Subscriber," "you" or "your") and Sirius XM Radio Inc. (the "Company," "us," "our" or "we") applies to your paid, trial or other subscription ("Subscription") to our satellite radio services ("Satellite Radio") …."  *Id.* at 1.  The top of that page also states that the Agreement will be binding if not cancelled.

Mueller never cancelled his subscription.  Nor did he ever object to any of the provisions of the Customer Agreement, including the arbitration provision.

### C. The Customer Agreement Requires Informal And Alternative Dispute Resolution

The Customer Agreement requires that, in the first instance, Mueller try to resolve informally any claim he might have against Sirius XM.  Ex. A, Customer Agreement at § L.1.  It provides that "neither of us may start a formal proceeding … for at least sixty (60) days after one of us notifies the other of a Claim in writing."  *Id.*  Mueller did not comply with this provision of the Customer Agreement before bringing this lawsuit.  Ruhland Decl. ¶ 33.

In the event this informal dispute resolution procedure proved unsuccessful, Mueller had to pursue any claims only in an arbitration proceeding before the AAA.  The Customer Agreement made that clear, too:

> PLEASE READ THE PROVISIONS OF THIS SECTION CAREFULLY.  IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION.  THIS MEANS THAT YOU ARE HEREBY WAIVING THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY.  IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY.  THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

Ex. A, Customer Agreement at § L.  The Customer Agreement further provides that the arbitration provision applies to all claims or disputes—*i.e.*, "[a]ny legal or equitable claim relating to the Service, the Site, your Subscription or this Agreement."  *Id.*  It also specifies what a subscriber must do to commence arbitration, including writing a demand for arbitration, sending copies to the AAA, and providing a copy to Sirius XM.  *Id.* at § L.2.  And finally, the Agreement specifies that the consumer agrees to a "Class Action Waiver."  *Id.* at § L.6.  Mueller has not complied with any of these simple and straightforward provisions of the Customer Agreement.  Instead, he filed this lawsuit in violation of the Agreement's dispute resolution process.

## II.     ARGUMENT

### A.     The Applicable Legal Standard

The FAA governs the arbitration and arbitrability of disputes.  It provides that, as a matter of federal law, "[a] written provision" in a commercial contract evidencing an intention to settle disputes by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *AT&T*

*Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).[5]  The FAA was enacted in response to "widespread judicial hostility to arbitration," and now compels a liberal federal policy favoring arbitration.  *Id.* at 339.  Courts must "rigorously enforce agreements to arbitrate."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985).

Supreme Court precedent compels rigorous enforcement of arbitration agreements with class action waivers.  *Concepcion*, 563 U.S. 333 (holding state laws prohibiting class action waivers in consumer contracts violate the FAA); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) (holding class waivers valid, even when cost of individual arbitration exceeds potential recovery); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) (holding class waivers valid, even in labor disputes).  Indeed, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter*, 470 U.S. at 218.  "Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures."  *Epic Sys. Corp.*, 138 S. Ct. at 1621.  Courts, therefore, enforce contract terms specifying "with whom the parties [chose] to arbitrate their disputes," and the "rules under which that arbitration will be conducted."  *Italian Colors*, 570 U.S. at 233; *see also Epic Sys. Corp.*, 138 S. Ct. at 1621.

---

[5]  It is well settled that telecommunications networks, including radio communications, are channels of interstate commerce.  *See, e.g.*, *Fisher's Blend Station, Inc. v. Tax Comm'n of Wash.*, 297 U.S. 650, 655 (1936) ("By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause."); *U.S. v. Carnes*, 309 F.3d 950, 954 (6th Cir. 2002) ("[T]elecommunications are both channels and instrumentalities of interstate commerce."); *Spetalieri v. Kavanaugh*, 36 F. Supp. 2d 92, 115 (N.D.N.Y. 1998) ("Telecommunication and/or radio communications are, themselves, channels of interstate commerce.").  Here, Sirius XM provides its satellite radio services throughout the country, including via on-ground terrestrial repeaters and to vehicles as they cross state lines.

Because arbitration is a matter of contract, in determining whether to compel arbitration under the FAA, the court must determine that (1) a valid and enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45 (2d Cir. 1993).[6]  If these factors are met, the court must enforce the arbitration agreement in accordance with its precise terms. *Concepcion*, 563 U.S. at 344.  Because of the strong public policy favoring arbitration, doubts are to be resolved in favor of compelling arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  "[T]he party resisting arbitration"—here, Plaintiff Mueller—"bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000).

On a motion to compel arbitration, the Court may consider the operative contracts and other evidence beyond the complaint such as the evidence offered here.  This is because courts apply a standard "similar to that applicable for a motion for summary judgment." *Meyer*, 868 F.3d at 74 (citation omitted).  That is, courts consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and

---

[6] The Second Circuit has articulated two additional factors to consider on a motion to compel arbitration, neither of which is applicable here. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004).  It asks the court, "if federal statutory claims are asserted, [to] consider whether Congress intended those claims to be nonarbitrable," and "if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Id.* at 169.

Here, Mueller asserts only TCPA claims, and the Second Circuit has held that Congress did not intend that TCPA claims would be nonarbitrable." *Moore v. T-Mobile USA Inc.*, 548 F. App'x 686, 687 (2d Cir. 2013) (summary order); *see also Velez v. Credit One Bank*, No. 15-CV-4752 (PKC), 2016 WL 324963, at *7 (E.D.N.Y. Jan. 25, 2016) (finding no evidence "that Congress meant to override the FAA's mandate and render TCPA claims non-arbitrable"); *Salerno v. Credit One Bank, NA*, No. 15-CV-516-JTC, 2015 WL 6554977, at *6 (W.D.N.Y. Oct. 29, 2015) ("[T]he few courts that have considered the issue have found nothing in the text or legislative history of the TCPA to suggest that Congress intended TCPA claims to be non-arbitrable"); *Lozada v. Progressive Leasing d/b/a Prog Leasing LLC*, No. 15-CV-2812 (KAM)(JO), 2016 WL 3620756, at *4 (E.D.N.Y. June 28, 2016) (same); *McCormick v. Citibank, NA*, No. 15-CV-46-JTC, 2016 WL 107911, at *5 (W.D.N.Y. Jan. 8, 2016) (same).

admissions on file, together with affidavits," and draw all reasonable inferences in favor of the non-moving party.  *Id.* (citation omitted).

     **B.**    **Mueller's Claims, If Not Informally Resolved, Must Be Arbitrated**

            **1.**    **Mueller Received the Customer Agreement.**

Sirius XM business records indicate that Mueller was sent the Welcome Kit containing the Customer Agreement, including the arbitration provision.  Ruhland Decl. ¶¶ 21–31. Specifically, Ms. Ruhland, who is Sirius XM's Director of Direct Mail Operations, Marketing Operations, testifies to the business practices and procedures that ensured that Mueller was mailed his Customer Agreement in the ordinary course of Sirius XM's business activities.  *See generally* Ruhland Decl.  In addition, the terms and conditions were also always available to Mueller on the Sirius XM website.  *Id.* ¶ 31; Ex. F; *see Schwartz v. Comcast Corp.*, 256 F. App'x 515, 520 (3d Cir. 2007) ("[T]he terms of the contract were available to Schwartz via the web site, and thus they are binding, despite the fact that he was unaware of them.").  Sirius XM's regular and ordinary course procedures establish a legal presumption that Mueller received it.

In New York (and consistent with the law elsewhere), proof of mailing gives rise to a rebuttable presumption that such mail was received.  *See Residential Holding Corp. v. Scottsdale Ins. Co.*, 729 N.Y.S.2d 776 (2d Dep't 2001).  The presumption may be created by "either proof of actual mailing or proof of a standard office practice or procedure designed to ensure that items are properly addressed and mailed."  *Id.*  Indeed, when "there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received."  *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985) (holding knowledge of office mailing procedures sufficient to establish prima facie evidence of mailing and created a rebuttable

presumption as to receipt) (citing *Nassau Ins. Co. v. Murray*, 386 N.E.2d 1085 (N.Y. 1978));

*Bronia, Inc. v. Ho*, 873 F. Supp. 854, 859 (S.D.N.Y. 1995) (same).

So, too, courts within this Circuit have compelled arbitration based on evidence of

mailing in affidavits substantially similar to the evidence offered here by Sirius XM.  In *Biggs v.

Midland Credit Management, Inc.*, for example, the defendant moved to compel arbitration of a

dispute brought by a consumer cardholder.  No. 17-CV-340 (JFB)(ARL), 2018 WL 1225539, at

*3–4 (E.D.N.Y. Mar. 9, 2018).  To establish that the terms and conditions (with an arbitration

provision) were mailed to the plaintiff, the defendant offered two affidavits from employees.

The affidavits contained evidence that (i) at the time plaintiff's account was opened, the

defendant "had a regular procedure of mailing a letter via United States Postal Service containing

the account number, and a copy of the credit card agreement that governed the account,"

(ii) pursuant to that procedure, the defendant "created a contemporaneous record to document the

mailing," (iii) the defendant maintained records of correspondence from cardholders, "including

requests to reject or opt out of an arbitration provision," (iv) the defendant's records reflect that,

"a letter containing the account number and a copy of the Account Agreement were mailed via

the United States Postal Service to plaintiff at her address of record in New York," (v) there is

"no record of plaintiff rejecting the arbitration provision," and (vi) "there is no record that the

agreement mailed to plaintiff was returned as undeliverable."  *Id.* at *8.  This evidence, the court

held, was "sufficient to establish that it was Synchrony's regular practice to send the Account

Agreement to the account holder at their address of record."  *Id.*

In *Kurz v. Chase Manhattan Bank USA, N.A.*, the court invoked the mailbox rule

presumption to enforce an arbitration agreement based on an affidavit of a vice president of the

marketing department "who described the operation of the 'permanent message system' that

-10-

defendant utilizes to track customer account activity, which includes mailings of notifications and agreements to the customer." 319 F. Supp. 2d 457, 464 (S.D.N.Y. 2004). The court held that "[d]efendant has proffered sufficient circumstantial evidence of mailing and is entitled to the presumption of receipt." *Id.* at 464; *see also Schwartz*, 256 F. App'x at 518 (Vice President described the company's consistent practice regarding delivery of subscription agreements; based on this evidence, the court held that the defendant had established that plaintiff "was aware that the services he accepted were being offered pursuant to a subscription agreement" and plaintiff could not rebut this).

The mailbox rule is applied in other jurisdictions, too. For example, the *Wright* court held that Sirius XM satisfied this presumption based on the same evidence, consisting of the same regular and ordinary course corporate procedures, that Sirius XM presents here to show the mailing of the Welcome Kit to Mueller. *Wright v. Sirius XM Radio Inc.*, No. SACV 16-01688 JVS (JCGx), 2017 WL 4676580, at *5, 8–9 (C.D. Cal. June 1, 2017) (Sirius XM "has presented substantial evidence" that "its third-party vendors mailed Wright a Welcome Kit that included a Customer Agreement. In particular, Sirius has presented evidence that (1) Sirius instructed its direct mail subcontractor to mail the kit to Wright at his Huntington Beach home and (2) the subcontractor actually fulfilled this request.").

Sirius XM has presented evidence that satisfies this jurisdiction's mailbox rule. Mueller cannot simply deny receipt, because a "mere denial of receipt does not rebut that presumption." *Meckel*, 758 F.2d at 817. Rather, "[t]here must be—in addition to denial of receipt—some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Id*. Mueller will be unable to do so.

**2.      The Customer Agreement Contained A Valid And Enforceable Alternative Dispute Resolution Clause To Which Mueller and Sirius XM Are Contractually Bound.**

The Court must next assess the validity of the arbitration agreement.  *Meyer*, 868 F.3d at 74.  Here, too, the record evidence is clear:  Mueller called Sirius XM to "sign up" for a trial subscription, setting up an account with Sirius XM and providing his home address and phone number to the call agent.  Ruhland Decl. ¶¶ 23–25.  The next day, Sirius XM instructed its mailing vendor to mail to Mueller a Welcome Kit (containing the Customer Agreement); the mailing vendor did so, establishing receipt, which, according to Sirius XM's (and the USPS's) business records, was scheduled to arrive at Mueller's home on May 22, 2020.  *Id.* ¶¶ 26–29; *see also* Section II.B.1.  Mueller never attempted to reject the terms of the service or otherwise cancel his subscription.  Ruhland Decl. ¶ 32.  As a result, a valid and binding contract exists under state law.

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (quotation omitted).[7]  Mutual assent and intent to be bound "may be by word, act, or conduct which evinces the intention of the parties to contract."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (2d Dep't 1998); *accord* Restatement (Second) of Contracts § 69(1)(a) (Am. Law Inst. 1981) ("[S]ilence and inaction operate as an acceptance" "where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.").  Continued use of a product or service after receipt of

---

[7] In New York, the party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence.  *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993).

the terms and conditions may constitute acceptance of those terms.  *Olsen v. Charter Commc'ns, Inc.*, No. 18CV3388 (JGK), 2019 WL 3779190, at *6 (S.D.N.Y. Aug. 9, 2019) (finding plaintiffs manifested assent to updated terms received in "Welcome Kit" and as stated on their bills through continued use of internet services); *cf. Manigault v. Macy's East, LLC*, 318 F. App'x 6, 8 (2d Cir. 2009) (reversing lower court, holding continued employment after receipt of mailing of arbitration notice is sufficient to manifest assent).  This is even so when the terms are sent only after the initial transaction.  *See Kowalski v. YellowPages.com, LLC*, No. CIV.A. 09-2382 (PGS), 2010 WL 3323749, at *4 (D.N.J. Aug. 18, 2010), *report and recommendation adopted*, No. CIV.A. 09-2382 (PGS), 2010 WL 3810156 (D.N.J. Sept. 22, 2010) ("Courts also have recognized transactions where consumers made purchases prior to getting the detailed terms of the contract….").  A party's "failure to read and understand the contents" of a document does not excuse his performance.  *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 701 (S.D.N.Y. 2017) (citing New York law).

Courts in this jurisdiction and elsewhere have long recognized that the facts presented here—*i.e.*, when the terms of the contract (here, the Customer Agreement) are sent after the purchase and not objected to within a specified period—are sufficient to define binding contracts.  For example, in *Brower v. Gateway 2000, Inc.*, the First Department held that "it is only after the consumer has affirmatively retained the merchandise for more than 30 days— within which the consumer has presumably examined and even used the product(s) and read the agreement—that the contract has been effectuated."  676 N.Y.S.2d 569 (1st Dep't 1998); *see also Andersen v. Walmart Stores, Inc.*, No. 16-CV-6488 CJS, 2017 WL 661188, at *11 (W.D.N.Y. Feb. 17, 2017) ("Accordingly, while Plaintiff argues that the only agreement he had with Dell and/or Walmart was created when he paid for the computer at the store, the law of

New York State indicates otherwise.  Rather, the agreement was created when Plaintiff kept and used the computer and/or clicked on the icon indicating that he accepted Dell's terms.").

A federal court in this jurisdiction also applied this principle under Texas law, holding valid a standard "approve-or-return" contract.  In *Sherr v. Dell, Inc.*, No. 05 CV 10097(GBD), 2006 WL 2109436 (S.D.N.Y. July 27, 2006), Dell shipped a copy of its terms and conditions along with a computer that was shipped after a consumer placed a telephone order.  The customer did not return the product or refuse delivery, and the court held that a valid contract had been formed.

Numerous courts in other jurisdictions agree.  In *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587 (1991), two passengers purchased tickets for a seven-day cruise and were subsequently mailed their tickets, which included a forum-selection clause.  The Supreme Court held that economic realities rendered the non-negotiated form contract valid and enforceable, even though consumers did not receive notice of it until after they had paid for their cruise tickets:  "Common sense dictates that a ticket of this kind will be a form contract the terms of which are not subject to negotiation, and that an individual purchasing the ticket will not have bargaining parity with the cruise line."  *Id.* at 593.

Similarly, in *Higgs v. Auto. Warranty Corp. of Am.*, 134 F. App'x 828, 831–32 (6th Cir. 2005), the Sixth Circuit examined—and enforced—an "approve or return" contract.  The plaintiff had received a solicitation by mail for an extended warranty for his car, which he completed and returned along with a check.  *Id.* at 829.  Later, he received by mail a Limited Warranty Service Contract that included an arbitration clause.  The document stated that he had ten days to cancel the contract if he so desired.  *Id.* at 829–30.  Higgs never canceled, and the court held that the facts were sufficient to create a valid "approve-or-reject" contract:  "Keeping

the warranty past ten days was sufficient to demonstrate agreement to the terms of the contract, including the arbitration clause." *Id.* at 832; *see also Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1151 (7th Cir. 1997) (finding arbitration clause valid where customer could return the computer within thirty days of purchase and receive a full refund but did not do so); *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (reversing lower court, holding plaintiff's continued use of AT&T's service constituted an acceptance of AT&T's offer contained in a customer service agreement in a mailing sent to plaintiff); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1101, 1105 (C.D. Cal. 2002) (enforcing arbitration provision where supplier mailed terms and conditions after activation of the satellite service, reasoning that even though the customer did not receive the agreement immediately, "[t]he more controlling issue is the economic and practical considerations involved in selling services to mass consumers which make it acceptable for terms and conditions to follow the initial transaction").

Here, as Mueller admits, he ***signed up*** for his Sirius XM trial subscription.  Compl. ¶ 5. He never rejected the terms of the Customer Agreement or otherwise attempted to cancel his service.  Ruhland Decl. ¶ 32.

Three courts have considered facts similar to the facts here—*i.e.*, Sirius XM's mailing of its Customer Agreement to subscribers following the commencement of those subscribers' subscriptions—and found those facts sufficient to constitute a valid and binding arbitration agreement under the approve-or-return cases discussed in this section.  In *Wright v. Sirius XM Radio Inc.*, the court found that the plaintiff agreed to the arbitration agreement when he called Sirius XM, purchased a subscription and was later sent the Customer Agreement in the mail.  "At that time he also received notice that Terms and Conditions would be forthcoming.  He then continued the relationship after receiving the Customer agreement in the mail."  2017 WL

4676580, at *6.  In *Combs v. Sirius XM Radio, Inc.*, the court granted Sirius XM's motion to compel arbitration when, like in this case and in *Wright*, Sirius XM sent the Customer Agreement after a phone-initiated subscription.  No. 7:15-cv-00037-FL, 2016 WL 6778856 (E.D.N.C. Jan. 7, 2016).  And in *Knutson v Sirius XM Radio, Inc.*, the court noted that "it would be impractical for [Sirius XM], a large service provider, to negotiate the terms of its Customer Agreement with each consumer prior to activating the service."  No. 12cv418 ABJ (NLS), 2012 WL 1965337 (S.D. Cal. May 31, 2012), *rev'd on other grounds*, 771 F.3d 559 (9th Cir. 2014).[8]

Sirius XM has proven the existence of an agreement containing an arbitration clause to which Sirius XM and Mueller are contractually bound.

### 3. Mueller's Dispute Falls Squarely Within the Scope of the Arbitration Provision, And Any Doubts Must be Resolved by the Arbitrator in Arbitration.

Next, the Court must resolve whether the arbitration clause encompasses the dispute in issue.  *Meyer*, 868 F.3d at 74.  Here, it clearly does.

The Second Circuit has explained that a court must first classify the instant arbitration provision as broad or narrow.  *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001).  While there are no absolute rules for determining whether an arbitration clause is narrow or broad, the court must decide if "the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if ... arbitration was designed to

---

[8]  The Ninth Circuit's decision in *Knutson*, refusing to enforce an arbitration provision, is distinguishable. There, the customer bought a vehicle that included a Sirius XM trial subscription.  He dealt only with the Toyota dealer and claimed to have no idea he was contracting with Sirius XM.  "Knutson did not affirmatively enroll in a subscription service with Sirius XM.  He did not separately provide his personal information to Sirius XM." *Knutson v. Sirius XM Radio Inc*., 771 F.3d 559, 569 (9th Cir. 2014).  Here, by contrast, Mueller called Sirius XM to "sign up" for and activate his trial subscription, providing his contact information.  He of course knew he was dealing with Sirius XM.

play a more limited role in any future dispute." *Id.* at 255 (citations omitted).  If it is broad, "there arises a presumption of arbitrability" and arbitration of collateral matters will be ordered if the claim "implicates issues of contract construction or the parties' rights and obligations under it." *Id.* at 224 (quotation omitted).  If it is narrow, the court is required to determine whether the dispute is over an issue that "is on its face within the purview of the clause," or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Id.*

Arbitration provisions that require any claims relating to the product/service or the underlying agreement to be arbitrated—similar to the provision at issue in this case—are routinely considered broad.  *See, e.g.*, *id.* at 225 (broad: "[a]ny dispute arising from the making, performance or termination of this Charter Party" be arbitrated); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc*., 369 F.3d 645, 649 (2d Cir. 2004) (broad: "any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement"); *Vera v. Saks & Co.*, 335 F.3d 109, 117 (2d Cir. 2003) (broad: "[a]ny dispute, claim, grievance or difference arising out of or relating to the Agreement"); *China Auto Care, LLC v. China Auto Care (Caymans)*, 859 F. Supp. 2d 582, 587 (S.D.N.Y. 2012) (broad: "[a]ll disputes, claims or controversies arising under this Agreement, including the breach, termination or validity thereof ... shall be finally settled by arbitration ...).  Indeed, the phrase "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause." *Collins & Aikman Products Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).[9]

---

[9] By contrast, arbitration clauses that courts have considered "narrow" typically require arbitration for particular categories of disputes only.  *See, e.g.*, *Microsoft Corp. v. Samsung Elec. Co., Ltd.*, 60 F. Supp. 3d 525, 529 (S.D.N.Y. 2014) (recognizing that a narrow arbitration clause "limit[s] arbitration to specific types of disputes," and finding the arbitration clause narrow where it provided for arbitration of "specific disputes related to reporting, accounting, and auditing"); *see also McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co*., 858 F.2d 825, 832–33 (2d Cir. 1988) (narrow arbitration clause which provided that, in the event of disputes over the "computation of the amount of the required indemnity payment or refund" then the parties "shall appoint an independent tax counsel to resolve the dispute"); *ACE Ltd. v. CIGNA Corp. and CIGNA Holdings, Inc*., No. 00 CIV. 9423 WK, 2001

For example, in *Getz v. Verizon Communications, Inc.*, Verizon sought to compel arbitration over a TCPA dispute based on the provision in the terms and conditions stating that "any dispute that in any way relates to or arises out of this agreement or from any equipment, products and services you receive from us (or from any advertising for any such products or services)" should be resolved in arbitration.  No. 18cv4652(DLC), 2018 WL 5276426, at *2 (S.D.N.Y. Oct. 24, 2018).  The court determined that the TCPA dispute was covered by the broad arbitration provision.  *Id.* at *3.  Likewise, in *Carr v. Credit One Bank*, the court held that a TCPA claim was covered by the "broad" arbitration clause that encompassed "any controversy or dispute between [plaintiff] and [defendant]" and any matter "relating to [plaintiff's] account." No. 15-cv-6663 (LAK), 2015 WL 9077314, at *1 (S.D.N.Y. Dec. 16, 2015).  And in *Wijesinha v. DIRECTV, LLC*, the court held that a nearly identical provision—"any legal or equitable claim relating to this Agreement, any addendum, or your Service"— is *broad*.  There, the plaintiff attempted to negotiate a new service contract, terminated services with defendant, and subsequently received the telemarketing calls regarding new service plan options, which the plaintiff alleged violated the TCPA.  The court held that "these calls are indeed related to Plaintiff's service and thus fall within the scope of the arbitration provision in the Customer Agreement."  No. 1:16-cv-22090-KMM, 2016 WL 10906449, at *3 (S.D. Fla. Sept. 29, 2016).

Here, Sirius XM's arbitration provision is akin to those deemed broad by numerous courts interpreting similar clauses.  It provides a dispute resolution mechanism for *any* "Claim," which is broadly defined as "**any legal or equitable claim relating to the Service, the Site,**

---

WL 767015, at *3 (S.D.N.Y. July 6, 2001) (arbitration clause referring to "points of disagreement concerning Tax matters").

**your Subscription or this Agreement**." Ex. A, Customer Agreement at § L.  Mueller's dispute squarely relates to matters addressed in the Customer Agreement—namely, Mueller's three-month trial subscription.  The telemarketing calls were connected to, and arise out of, his trial subscription with Sirius XM.  Compl. ¶ 5 ("Plaintiff signed up for a free trial with SiriusXM on May 13, 2020 …."); Ruhland Decl. ¶ 5 (explaining that the telemarketing calls relate to the trial subscription and offers to convert to paid); *see also* Ex. A, Customer Agreement at 1 ("This customer agreement … applies to your paid, trial or other subscription").  Calls were placed to Mueller precisely because he had a trial subscription with Sirius XM and had availed himself of the benefits of Sirius XM's satellite radio service.  Multiple courts have considered the exact same clause in Sirius XM's Customer Agreement and found that it encompassed the exact same statutory dispute (a TCPA claim) that Mueller asserts here.  *See Combs*, 2016 WL 6778856 (granting motion to compel arbitration in TCPA case); *Knutson*, 771 F.3d 559 (same).

Finally, even if there were any doubts about the scope of this broadly worded arbitration provision (there should be none), any such doubts should be resolved only by the arbitrator since the arbitration provision requires the application of AAA rules.  Ex. A, Customer Agreement at § L.2.  As the Second Circuit has held, arbitrability should be referred to the arbitrator "if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator."  *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005).  In *Contec Corp.*, as here, the arbitration provision referenced the AAA rules.  The Second Circuit held that the "the incorporation [of the AAA Rules] serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Id.*  Courts generally agree that "incorporation of the [AAA's] arbitration rules constitutes clear and unmistakable evidence that

the parties agreed to arbitrate arbitrability." *Oracle Am. v. Myriad Grp.*, 724 F.3d 1069, 1074

(9th Cir. 2013); *Terminix Int'l Co. LP v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir.

2005); *see* Ex. A, Customer Agreement at § L.2 ("The party initiating arbitration must follow the

rules and procedures of the American Arbitration Association ('AAA').").

### C.     Mueller Has Failed to Comply With the Dispute Resolution Provisions of His Customer Agreement

Mueller ignored the Customer Agreement's condition precedents to filing any formal

proceeding.  Courts consistently enforce compliance with such conditions, and staying these

proceedings on that ground alone is appropriate.  *See, e.g.*, *Cont'l Cas. Co. v. Stronghold Ins.*

*Co., Ltd.*, 77 F.3d 16, 19 (2d Cir. 1996) ("[P]arties are free, within limits of public policy, to

agree upon conditions precedent to suit."); *see also Dominion Transmission, Inc. v. Precision*

*Pipeline, Inc.*, No. 3:13cv442–JAG, 2013 WL 5962939, at *4 (E.D. Va. Nov. 6, 2013) ("The

Court, when confronted with a defendant's objection that the plaintiff failed to comply with a

condition precedent, has the discretion to either stay or dismiss the case."); *Tattoo Art, Inc. v.*

*TAT Int'l, LLC*, 711 F. Supp. 2d 645, 651 (E.D. Va. 2010) (finding dismissal warranted where

plaintiff did not fulfill the condition precedent to "request mediation prior to commencing the

instant lawsuit"); *Mortimer v. First Mount Vernon Indus. Loan Ass'n,* No. Civ. AMD 03-1051,

2003 WL 23305155, at *3 (D. Md. May 19, 2003) (lawsuit deferred where plaintiff failed to

meet his "binding obligation first to mediate his claims," a condition precedent to litigation).

If the informal resolution process fails, the Sirius XM subscriber is then obligated under

the Customer Agreement to initiate and participate in formal binding arbitration before the AAA

under applicable AAA Rules.  Ex. A, Customer Agreement at § L.  There is nothing ambiguous

about this requirement, and the agreement clearly provides guidance on how to start such a

proceeding and provides information as to cost allocation for such arbitration.  *Id.*  Mueller has failed to comply with this requirement.

**III.**    <u>**CONCLUSION**</u>

    Sirius XM respectfully requests that this Court issue an order (i) staying the Complaint in its entirety, (ii) directing Mueller to try to resolve this dispute through the informal dispute resolution procedure required by the parties' contract, and (iii) in the event the informal dispute resolution procedure fails to resolve this case, compelling Mueller either to (a) arbitrate his claims against Sirius XM before the American Arbitration Association on an individual, non-class basis or (b) pursue his individual claims (as permitted by the parties' contract) in small claims court.

Dated: January 15, 2021

Respectfully submitted,

*/s/ Allison L. Waks*

_____

Lee A. Armstrong
Allison L. Waks
JONES DAY
250 Vesey Street
New York, New York
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: laarmstrong@jonesday.com
Email: awaks@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

*Attorneys for Defendant Sirius XM Radio Inc.*

**CERTIFICATE OF SERVICE**

I, Allison L. Waks, hereby certify under penalty of perjury that on January 15, 2021, I caused a true and correct copy of the foregoing to be filed with the Court and served on counsel of record by ECF.

Dated: New York, New York                    */s/ Allison L. Waks*
        January 15, 2021                         Allison L. Waks